**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LADELL DEANGELO BROWN,
        *Petitioner-Appellant,*

v.

R. HORELL, Warden; ATTORNEY
GENERAL OF THE STATE OF
CALIFORNIA,
        *Respondents-Appellees.*

No. 09-16643

D.C. No.
2:07-cv-01994-
LKK-CHS

OPINION

Appeal from the United States District Court
for the Eastern District of California
Lawrence K. Karlton, Senior District Judge, Presiding

Argued and Submitted
May 9, 2011—San Francisco, California

Filed July 12, 2011

Before: Ronald M. Gould and Milan D. Smith, Jr.,
Circuit Judges, and Algenon L. Marbley, District Judge.*

Opinion by Judge Marbley

---

*The Honorable Algenon L. Marbley, United States District Judge for
the Southern District of Ohio, sitting by designation.

## COUNSEL

Mark D. Eibert (argued), Half Moon Bay, California, for the petitioner-appellant.

David A. Eldridge (argued), Deputy Attorney General, Sacramento, California, for the respondent-appellee.

## OPINION

MARBLEY, District Judge:

Appellant LaDell DeAngelo Brown is a state prisoner seeking a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. A Sacramento County Superior Court jury convicted Brown in 2005 of first degree murder, attempted murder, and attempted robbery with enhancements for firearm use and prior convictions. He was sentenced to life without the possibility of parole plus an additional term of 74 years to life. In this appeal, we consider whether the district court erred in denying Brown's petition for a writ of habeas corpus. Brown contends that he is entitled to habeas relief on two independent grounds: (1) his coerced and involuntary admissions were improperly admitted into evidence at trial; and (2) the trial court's exclusion of expert testimony regarding the interrogation methods used by law enforcement at his interviews prevented him from presenting a complete defense. For the reasons that follow, we affirm the district court's denial of Brown's petition for a writ of habeas corpus.

## I. BACKGROUND

### A. The Shooting

The following facts, presumed to be correct under 29 U.S.C. § 2254(e), are excerpted from the Court of Appeal of California's decision:[1]

> Jaynelle Frank checked into room 106 at the Gold Rush Inn in Sacramento on Monday, April 8, 2002. [Brown], the father of Jaynelle's unborn child, was staying at the Inn with her. Jaynelle's younger sister, Johtell Frank, checked into room 108 at the Gold

---

[1] *People v. Brown*, No. C050121, 2006 Cal. App. Unpub. LEXIS 5409 (Cal. Ct. App. June 23, 2006).

Rush Inn on the same day. With Johtell at the Inn was her boyfriend and [Brown]'s best friend, Dante Alexander.

The victims, Victor Jones and his wife Cheryl, checked into room 207 at the Gold Rush Inn early the following evening, Tuesday, April 9, 2002, at approximately 5:00 or 6:00 p.m. Prior to meeting [Brown], Victor purchased and consumed a quantity of cocaine on G Parkway before returning to the Inn around 12:00 a.m. on April 9. Victor met [Brown] in the parking lot at about midnight on April 9 and bought cocaine from him.

Later, in the early morning hours of April 10, [Brown] sold Victor more cocaine. Over the next several hours, Victor purchased approximately $100 worth of cocaine from [Brown] on credit. In exchange for the extension of credit, Victor allowed [Brown] to borrow his Kia van, which was on loan from the dealership. [Brown] left in the van with Dante and returned around 2:00 or 2:30 a.m. Victor purchased more cocaine on credit and [Brown] kept the car keys. When Victor went to [Brown]'s room between 4:00 and 5:00 a.m. to ask for more cocaine, [Brown] told him he had no more.

Around 8:00 a.m. on April 10, [Brown] and Jaynelle accompanied Victor to pick up and cash his paycheck. [Brown] saw Victor's paycheck which was over $500. Victor paid [Brown] what he owed for the cocaine, and [Brown] asked if he could borrow the van to take Jaynelle to her prenatal appointment. Victor agreed when [Brown] promised to sell him more cocaine.

[Brown] took the van, and Victor and his wife stayed at the Inn to smoke the cocaine. [Brown] checked in

with Victor from time to time, sold him more cocaine, and left again with Dante in the van. Victor received a telephone call from [Brown] around 6:00 p.m. on April 10 informing him that the van had been stolen. Victor did not believe the story and told [Brown] to return to the Inn.

When [Brown] returned to the Inn with Dante about 20 minutes later, Victor bought more cocaine. Victor told [Brown] the explanation about the van was "bullshit" and demanded to know how [Brown] planned to make things right. When Victor suggested [Brown] return the money he had already paid for cocaine, [Brown] gave Victor $20 and a quarter ounce of cocaine. Satisfied, Victor told [Brown] he would pay for Jaynelle's room so [Brown] would not have to "hustle" that night for the money. Victor walked with [Brown] and Dante to a liquor store where Victor bought alcohol for all of them.

Shortly after Victor returned to his room, Dante's girlfriend Johtell appeared at his door. She claimed an interest in the cocaine [Brown] had given Victor as compensation for loss of the van. Victor verbally rebuffed Johtell and later complained to Dante about her conduct. Victor continued to smoke cocaine and think about how he could get [Brown] to return the van.

Around midnight, Johtell and Dante came to Victor's room and asked him to buy more liquor for them. Victor agreed to walk to the store, but they insisted on giving him a ride. Cheryl decided to go along. Victor emptied his pockets of cash and illegal items before leaving the room. Dante and Johtell went downstairs ahead of Victor. Victor heard Jaynelle say to Johtell, "You know what they about to do? That's fucked up."

The four left the Inn with Johtell driving Dante's car, Cheryl next to her in the front seat, Dante in the back seat on the driver's side, and Victor in the back seat on the passenger side. Instead of driving to the liquor store, Johtell headed south on Highway 99 and turned off the freeway at Sheldon Road in Elk Grove. En route, Johtell ignored Victor's repeated demands to pull over and let him get out of the car. Johtell was driving erratically while talking with someone on her cell phone. Victor also observed what he thought was a police car following them. It flashed its high beams once they left the freeway.

Johtell drove east on Sheldon Road and stopped the car on a dark, dead-end street. The second car pulled up behind Dante's car. Dante stepped out of his car, turned toward Victor with what Victor described as a .45-caliber handgun, and said, "Give me everything you got." Victor gave Dante $12, his wallet, wrist watch and room key. [Brown] walked up with an automatic rifle and ordered Cheryl and Victor out of the car. He demanded to know where the narcotics were. Victor explained he left the cocaine in the room. Johtell confirmed that she had seen Victor empty his pockets into a drawer before they left.

Victor tried to stay in front of Cheryl as they got out of the car. He noticed a light in a nearby house. Victor began talking loudly and tried to maneuver in the direction of the house. [Brown] told him to be quiet. Victor continued to talk, offering to give [Brown] more money later that day if he let Cheryl leave. Finally, Victor charged past [Brown] and Dante. Cheryl was supposed to run the opposite direction. Dante shot Victor once as he ran, but Victor continued toward the house. Victor then heard both guns firing and received two more wounds. He was close to the front door of the house when his foot was shot

from under him. Victor looked back and saw [Brown] use the rifle to shoot Cheryl.

Victor broke the windows around the front door of the house and yelled for help. [Brown] approached Victor on the porch, holding the handgun Dante had in the car. [Brown] pointed the gun at Victor's head. One of the cars departed, leaving [Brown] behind. After the gun misfired several times, [Brown] came close to Victor and said, "You are a lucky mother fucker." Victor responded, "You are a dead mother fucker, you understand." [Brown] drove away.

Owen Autry, the occupant of the house, was awakened by gunfire at 1:30 a.m., and immediately telephoned 911. While Autry stayed on the line with the 911 operator, Victor yelled that the people who shot him were in apartments 106 and 108.

Cheryl died at the scene. Based on the size of the wounds, the pathologist testified the bullet was likely fired at close range by a .223 assault rifle. Victor suffered four bullet wounds, but survived. He viewed a photo array six hours after the incident and identified Dante as the man in room 108 who had the handgun. He viewed more photos the following day and identified [Brown] as the man in room 106 who had the rifle. Victor testified at trial.

## B.   Brown's Interrogations

Sacramento County Sheriff's Detectives Bill Bayles and Grant Stomsvik picked Brown up on a parole violation on April 12, 2002. After Brown's arrest, Detectives Bayles and Stomsvik interviewed Brown three times. The first interview occurred on April 12, 2002. On that date, Detective Bayles advised Brown of his *Miranda* rights and began questioning Brown about the homicide in Elk Grove. Brown initially

denied being at the Gold Rush Inn the week of the homicide or knowing Victor. The detectives confronted Brown with a surveillance photo of Brown and Victor together at a 7-Eleven store, and Brown admitted that he knew Victor, that he spent time at the Gold Rush Inn, that Victor owed him money for cocaine, and that he had borrowed and wrecked Victor's van.

The detectives pushed Brown further to stop lying. They told him that Dante had already identified Brown as Cheryl's shooter and the mastermind of the robbery; Brown denied these allegations. Brown also denied that he was present at the scene of the homicide, claiming instead that he was at his mother's boyfriend's house. Then

> [t]he detectives told [Brown] they knew he was at the scene of the shootings. Thereafter, [Brown] admitted he followed Dante's car with someone named Anthony who told him they were going to get their money back. When they pulled onto a dark street off Highway 99, everyone got out of the cars except [Brown]. [Brown] heard gunfire and saw sparks coming from Dante's gun. Someone yelled, "I missed him" or "I hit him" or "He's still alive." [Brown] saw Victor run toward a house, but did not see anyone chase him. [Brown] never saw the woman. Anthony got back in the car, made a U-turn, and dropped [Brown] off at his mother's boyfriend's house.
>
> The detectives continued to accuse [Brown] of lying about his involvement in the shooting. They told [Brown] that Victor had identified him as one of the shooters. [Brown] eventually admitted he made up the name Anthony and that Sirrano Haywood drove the car he rode in to the scene of the crime. [Brown] also admitted he got out of the car with Haywood. He said he immediately got back into the car because

he was scared and denied he was involved in the shooting.

The following exchange occurred near the end of the interrogation:

"DET. STOMSVIK: [W]hat do you want to do now? You're involved up to your eyeballs in a murder, attempt[ed] robbery.

"[BROWN]: I wish I can go home and just lay down with my—with my girl. [¶] . . . [¶] And hold her stomach and kiss—and kiss her stomach and talk to my baby through her stomach."

Detective Stomsvik did not acknowledge [Brown]'s reference to Jaynelle and his baby. Instead, Stomsvik asked if [Brown] was willing to take a polygraph test. [Brown] stated that he was.

Brown took the polygraph on April 15, 2002, while still in police custody:

Detective Bayles introduced [Brown] to Jeanie Overall, a polygraph examiner employed by the Attorney General's Office. Overall advised [Brown] of his Miranda rights and explained he could not be forced to take the polygraph. [Brown] affirmatively agreed to speak to Overall and take the polygraph examination.

Overall asked [Brown] several questions about his background. In response to a question regarding his marital status, [Brown] stated he was excited that his girlfriend Jaynelle was pregnant with his first child. He said he "was hoping [he'd] be there to see her have it." Overall answered, "That would be nice," and went on to another question. Later, when Overall

asked, "What's the best thing that's happened to you in your life?" [Brown] responded, "Probably my girl being pregnant." Overall turned to a different topic.

With respect to the polygraph test, Overall cautioned [Brown]: "There's all different types and kinds of polygraph tests that people can take. The one that you're scheduled to take this evening is . . . termed a specific because it's dealing with a specific thing that's happened. In this case it's the murder of Cheryl Jones. . . . [¶] . . . [¶][T]his is the type or kind of test that this polygraph instrument was originally built and designed for. It's at its utmost accuracy and capability in this type of test. Now due to that, I very straightforwardly advise everybody that comes in with me, if you're not gonna pass your polygraph, do not take it. As long as everything you tell me about this case is one hundred percent the truth, you ought to take the test and show that what you're saying is true. . . . If somebody really wants to, quote, beat a polygraph, the way to do it is stand up, walk out and don't take the test." Overall explained that based on the results of the polygraph, she would report to the Sheriff's Office if she believed [Brown] was telling the truth. She also confirmed that although her report became part of [Brown]'s permanent case file, the polygraph result could not be used in court. Overall then reiterated, "Now, I've been doing homicide polygraphs for a long time, and when I tell you that it requires you to be one hundred percent truthful, I really can't stress that enough. This thing does not measure deception in degrees. . . ."

Overall questioned [Brown] about how he got involved in the homicide, and [Brown] repeated the story of his innocent presence at the scene of the shootings. She told [Brown] once more that she

would "give a report to the people here at the sheriff's office on [his] truthfulness and [his] honesty."

During a pretest, [Brown] answered "No" to the following questions: (1) "Did you shoot Cheryl Jones April the 11th in Elk Grove?" (2) "Did you shoot anyone in Elk Grove [on] the 11th?" (3) "Do you know where the gun is located that was used to shoot Cheryl Jones?" [Brown] responded in the same manner when asked the same questions during the polygraph examination. His responses were the same on the second and third tests.

Overall informed [Brown] that the polygraph test showed he was lying when he responded "No" to the key questions. She continued, "[T]here is no way, Ladell, with these charts that I can do anything but report to these detectives here that you're not telling the truth about this shooting." Emphasizing that [Brown] was involved in "some heavy stuff," Overall told [Brown], "I wish your life could have been different, and I still think you can make it different. . . . I want you to see that—that baby be born. I don't know why, but I feel like it's a boy." [Brown] confirmed that someone else had told him the same thing.

Overall urged [Brown] to tell her the truth about what happened. "I don't know if you don't tell me what the truth is. I'm not a mind reader. . . . You have a choice you can tell the truth and try to get this mess straightened out and let me go out there and talk to those detectives and try to do whatever I can for you, and I want to tell your side of what happened. I can't do that if you won't tell me." She offered several possible explanations for [Brown]'s involvement as a shooter.

. . . .

[Brown] offered another version of the events. He said he "was tryin' to talk to Victor for nothin' to happen" and placed himself between Victor and Cheryl so the two gunmen could not shoot them. According to this account, Cheryl pushed [Brown], causing him to stumble. [Brown] ran to the car when the guns started going off. He repeated he "[d]idn't shoot nobody."

Overall suggested she could pack up and go home. She told [Brown], The "only reason I'm talkin' to you is cuz you got a baby on the way, and I'd like to see you get to be with that baby, and these [detectives] have got a case they have to work." [Brown] said, "I wish I could be there for my baby." Overall responded, "I want to see you be there for your baby. . . . I can't get your side of what happened out there if you don't tell me. Do you want me to go get them? Do you want to let it go down like this? Or do you want to do the right thing for yourself, for your girlfriend and for your baby?" [Brown] repeated that he wanted to "be able to see the baby born." Overall said, "Okay. I want—I want that, too. . . . [¶][W]e need to tell them that. I can't go out there and talk to them for you if you're not going to tell me what happened." [Brown] continued to deny he had a firearm or shot Cheryl.

Overall suggested that Victor, a security guard, might have had a gun or tried to hurt [Brown] in some way. [Brown] agreed that Victor charged him and he shot at Victor with the 9-millimeter hand gun to scare him into stopping. [Brown] added he was not trying to hit Victor. He maintained someone else shot Cheryl after she pushed against [Brown]'s shoulder.

After admitting that he had shot Victor, [Brown] said, "This accident is gonna cost me my life." He told Overall he had lied because he was scared. He continued: "Scared for my baby. I want to be there for my baby. I wish I could go to my baby right now. . . ." After asking [Brown] if he had seen Jaynelle since his arrest, she changed the subject and asked if he wanted the detectives to return.

Overall summarized the results of the polygraph, and the substance of her interview with [Brown], for Detectives Bayles and Stomsvik. She indicated, "[H]e does want to be able to see his baby, and I told him I felt certain that he is gonna be able to." Stomsvik responded, "I wouldn't see why not." When Overall left the room, she said: "Ladell, good luck to you. You keep tellin' the truth, okay, and you're gonna see that baby."

Before continuing the interrogation, Detective Bayles confirmed that [Brown] was going to jail for murder. [Brown] then repeated his story to Bayles and Stomsvik. He maintained he heard gunshots when Cheryl pushed him and caused him to stumble. [Brown] said he tried to shoot at Victor's legs when Victor charged at him. He saw Dante do some shooting and "supposed" that Sirrano fired some shots. [Brown] denied that he or anyone else followed Victor up to the house after he was shot. [Brown] stated that Dante gave the rifle to Sirrano before they left the scene. At the end of the interrogation, [Brown] asked the detectives for a "big favor." He told them he wanted to kiss his girl's stomach and talk to his baby. Detective Bayles responded, "Well, you know, you're probably not gonna get to actually touch your girl—it's gonna be a while. . . . We'd be lying if we told you something different. I don't think you're gonna get any kind of contact visit until this whole

thing is settled and you're either out or—or transferred and locked up where you're gonna be locked up for, you know, more time. I don't think you're gonna get it at the jail you're goin' to here."

Brown's third and final interrogation occurred on April 18, 2002, with Detectives Bayles and Stomsvik. After the detectives advised Brown of his *Miranda* rights, Brown retracted his admissions of April 15. He denied that he had a gun and denied shooting either Victor or Cheryl. He claimed that he gave a false confession because he had heard that Sirrano Haywood had threatened to shoot Jaynelle. Detective Bayles told Brown that he did not believe Brown's retraction, but Brown persisted. Brown admitted that he knew about the robbery plan in advance of its execution but denied that he had a firearm. Detectives Bayles again told Brown that he did not believe Brown's retraction.

## C.   The Suppression Hearing and Trial

Brown's defense counsel moved to suppress Brown's April 15, 2002 admission that he shot Victor, as well as the other statements he made during his three interviews. In support of his motion, defense counsel presented video and audio recordings of the interviews and the testimony of Dr. Richard Ofshe, a retired professor of social psychology. Dr. Ofshe testified about the methods by which modern interrogation techniques produce false confessions. With respect to Brown's interrogations, "Ofshe opined that Overall induced [Brown] to admit he shot Victor accidentally or in self-defense by leading [him] to believe he would receive leniency." Dr. Ofshe "did not offer an opinion on whether [Brown]'s statements were true or false," but defense counsel relied upon Dr. Ofshe's testimony to argue that Brown's "confession was coerced by Overall's promise that [Brown] would be able to see the birth of his baby if he admitted he shot Victor accidentally or in self defense."

The trial court denied Brown's motion to suppress because it found that his admissions were voluntary. As summarized by the appellate court, the trial court cited several factors upon which it relied in reaching its conclusion:

> First, the court cited Dr. Ofshe's reference to a study that showed "the strength of the evidence that the police bring to bear upon [Brown] is the best predictor of when a guilty person will confess." Here, the deputies had talked to Victor and Autry. They told [Brown] "right up front" that he was going to be arrested for murder regardless of his statements. Second, [Brown] stated the sole reason he lied about having a gun and participating in the shooting was Sirrano's threat to shoot Jaynelle. [Brown] made no reference to Overall's interrogation methods or the alleged promise of preferential treatment when he retracted his earlier admissions. Third, the court found none of the interrogation methods employed by Overall "were . . . of the type likely to lead to an untrue statement."

The government played redacted videotapes of the interviews of April 12, 2002, and April 15, 2002, and the redacted audiotape of the interview of April 18, 2002, on three of the five days in which evidence was presented at Brown's jury trial in May 2005. The jury also heard Victor's account of the shootings. Victor testified that he saw both Brown and Dante shoot him and that he saw Brown shoot Cheryl with the long gun.

Defense counsel sought to call Dr. Ofshe to the stand for questioning regarding interrogation methods that tend to produce false confessions. Although the trial court found that Dr. Ofshe qualified as an expert, it nevertheless excluded his testimony. Recognizing that "the question was whether the expert testimony 'would be helpful to the jurors' as they assessed the credibility of [Brown]'s statements," the court concluded that

"the reason [Brown] gave for making false statements—that Sirrano threatened to kill someone close to him—was within the common experience of a jury." The defense rested without presenting any evidence.

The trial court instructed the jury on felony murder as the only theory of first degree murder. The jury convicted Brown of first degree murder, attempted murder, and attempted robbery, and the court sentenced Brown to life without the possibility of parole plus an additional term of seventy-four years to life.

## II.   JURISDICTION

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 2253 following the district court's issuance of a certificate of appealability.

## III.   STANDARD OF REVIEW

Brown's petition for a writ of habeas corpus was filed after April 24, 1996, and is therefore governed by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). *See Himes v. Thompson*, 336 F.3d 848, 852 (9th Cir. 2003). Under AEDPA, Brown can prevail on his petition only if he can show that the state court adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A decision can be "contrary to" federal law in one of two ways: if it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)

(O'Connor, J., concurring); *see also Lockyer v. Andrade*, 538 U.S. 63, 73 (2003); *Musladin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009). A decision involves an "unreasonable application" of federal law "if it correctly identifies the governing rule but unreasonably applies it to a new set of facts, or fails to extend a clearly established legal principle to a new context in a way that is unreasonable." *Himes*, 336 F.3d at 852 (internal citations omitted). The application must be "objectively unreasonable," and we may only consider our Circuit precedent as "relevant persuasive authority in determining whether a state court decision is objectively unreasonable." *Id.* (internal quotations omitted).

"We review the last reasoned state court opinion," *Musladin*, 555 F.3d at 834, and presume that the state court's factual findings are correct, 28 U.S.C. § 2254(e)(1). We review *de novo* the district court's denial of appellant's petition for habeas relief. *Musladin*, 555 F.3d at 834.

## IV. DISCUSSION

### A. Involuntary Confession

In this appeal, Brown claims that the state trial court violated his constitutional rights when it allowed the government to introduce his admissions of April 15, 2002, that he had shot Victor. Brown's position is that Overall's promise that Brown would be free to participate in his child's birth if only he told the truth coerced him into making an involuntary confession and that the state appellate court unreasonably erred in concluding otherwise.

The Court of Appeal of California analyzed the voluntariness of Brown's admissions under the totality of the circumstances. *See Withrow v. Williams*, 507 U.S. 680, 693-94 (1993). It concluded that "Overall made no coercive or deceptive 'promises' " and that the record supported the trial court's "finding that Overall's tactics did not overcome [Brown]'s

exercise of free will." It found that "[a]t no time did [Overall] promise [Brown] he would be freed," and that the fact that Brown asked Detectives Bayles and Stomsvik at the end of the interview for the "big favor" of being allowed to see his girlfriend demonstrated that Brown did not take "Overall's statements as a promise he would be released for telling the truth." It also relied on the fact that Brown retracted his admissions without reference to Overall's tactics.

[1] Involuntary or coerced confessions are inadmissible at trial, *Lego v. Twomey*, 404 U.S. 477, 478 (1972), because their admission is a violation of a defendant's right to due process under the Fourteenth Amendment, *Jackson v. Denno*, 378 U.S. 368, 385-86 (1964). A confession is involuntary if it is not " 'the product of a rational intellect and a free will.' " *Medeiros v. Shimoda*, 889 F.2d 819, 823 (9th Cir. 1989) (quoting *Townsend v. Sain*, 372 U.S. 293, 307 (1963)); *see also Blackburn v. Alabama*, 361 U.S. 199, 208 (1960). A "necessary predicate" to finding a confession involuntary is that it was produced through "coercive police activity." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Coercive police activity can be the result of either "physical intimidation or psychological pressure." *Townsend*, 372 U.S. at 307, *overruled on other grounds in Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992)*; see also Blackburn*, 361 U.S. at 206 ("[C]oercion can be mental as well as physical, and . . . the blood of the accused is not the only hallmark of an unconstitutional inquisition."). Whether a confession is involuntary must be analyzed within the "totality of the circumstances." *Withrow*, 507 U.S. at 693. The factors to be considered include the degree of police coercion; the length, location and continuity of the interrogation; and the defendant's maturity, education, physical condition, mental health, and age. *See id.* at 693-94; *Yarborough v. Alvarado*, 541 U.S. 652, 668 (2004).

[2] The Supreme Court has twice before addressed the admissibility of confessions extracted through threats or promises relating to a suspect's children. In *Haynes v. Wash-*

*ington*, the Court ruled that a written confession was coerced and involuntary where the police obtained it through the "threat of continued incommunicado detention" if the suspect did not confess and the "promise of communication with and access to family" if he did. 373 U.S. 503, 514 (1963); *see also Hutto v. Ross*, 429 U.S. 28, 30 (1976) (per curiam) (holding that confessions " 'obtained by any direct or implied promises, however slight' " may be involuntary (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)). Similarly, in *Lynum v. Illinois*, the Supreme Court found that it was "abundantly clear that the petitioner's oral confession was made only after the police had told her that state financial aid for her infant children would be cut off, and her children taken from her, if she did not 'cooperate.' " 372 U.S. 528, 534 (1963). The Court held "that a confession made under such circumstances must be deemed not voluntary, but coerced." *Id*.

**[3]** *Haynes* and *Lynum* demonstrate that threats and promises relating to one's children carry special force. Interpreting these cases, the Ninth Circuit has previously concluded that "[t]he relationship between parent and child embodies a primordial and fundamental value of our society." *United States v. Tingle*, 658 F.2d 1332, 1336 (9th Cir. 1981). When interrogators "deliberately prey upon the maternal [or paternal] instinct and inculcate fear in a [parent] that [he or] she will not see [his or] her child in order to elicit 'cooperation,' they exert the 'improper influence' proscribed by *Malloy* [*v. Hogan*, 378 U.S. 1, 7 (1964)]." *Tingle*, 658 F.2d at 1336.

**[4]** The record reveals that, as in *Haynes*, *Lynum*, and *Tingle*, Overall coerced Brown into confessing by conditioning his ability to be with his child on his decision to cooperate with the police. The connection between Brown's truthfulness and Brown's ability to be with his girlfriend and child was a major, if not the dominant, theme running throughout Overall's interrogation. Picking up on Brown's comment that his girlfriend's pregnancy was "the best thing that's happened to

[him] in [his] life," Overall returned again and again to the subject of the pregnancy before Brown confessed:

OVERALL:    . . . Now, you were involved in this shooting, and I know you were. . . . I wish your life could have been different, and I still think you can make it different. Nobody can make it different but you. I want you to see that— that baby be born. I don't know why, but I feel like it's a boy.

BROWN:    It is. How you know?

OVERALL:    I don't know. I just feel that way.

BROWN:    Somebody else told me that.

OVERALL:    Yeah. I feel like it—I feel like it's a boy, and I want to see you be with that baby.

. . . .

OVERALL:    . . . You have a choice[:] you can tell the truth and try to get this mess straightened out and let me go out there and talk to those detectives and try to do whatever I can for you, and I want to tell your side of what happened. I can't do that if you won't tell me. That baby growing in your girlfriend right now needs you. It's gonna need you a whole lot (unintelligible) and I want to see you be able to be with that child and have a life, but only the truth is going to take you to

that place. What happened that night out there?

. . . .

OVERALL: And I know you know the right thing to do. I know you know it, and I believe you want to do the right thing.

BROWN: Just want to be there for my baby.

OVERALL: I want you to be there for your baby, and what's gonna take you there is the truth. The truth is what's gonna let you be there for your baby, and I want that baby the first time he—

BROWN: That's all I want.

. . . .

OVERALL: . . . You're either gonna keep on lyin', or you're gonna tell the truth. I have to go give these detectives the results.

BROWN: They're gonna think I'm lyin', too.

OVERALL: Sure, they are, and I can't imagine what would keep you from telling the truth with that little baby boy waitin' to be born.

BROWN: I'm never gonna see my baby, and it hurts. It hurts. You don't know how I feel.

OVERALL: I think you are going to see your baby. I firmly believe that.

. . . .

OVERALL:  . . . Only reason I'm talking to you is cuz you got a baby on the way, and I'd like to see you get to be with that baby, and these guys have got a case they have to work.

BROWN:    I wish I could be there for my baby.

OVERALL:  I want to see you be there for your baby . . . . I can't get your side of what happened out there if you don't tell me. Do you want me to go get them? Do you want to let it go down like ths? Or do you want to do the right thing for yourself, for your girlfriend and for your baby?

BROWN:    Yes, I do.

OVERALL:  Then, please, do that.

BROWN:    I want to be able to see the baby born.

OVERALL:  Okay. I want—I want that, too. I want that, too

. . . .

BROWN:    No, my life is over.

OVERALL:  No. It's not over. Life is not over.

BROWN:    (Unintelligible) my baby.

OVERALL:  Yes, you will. Yes, you will.

BROWN: I'm never gonna be able to hold my baby.

OVERALL: Yes, you will.

BROWN: No.

OVERALL: You will. He ran at you; is that what he did? I need you to tell me, LaDell.

BROWN: Yes, ma'am.

Brown then admitted to having shot Victor twice with the handgun. Overall questioned him further about the details of that night before bringing Detectives Stomsvik and Bayles back in and summarizing her interview with Brown:

OVERALL: And he does want to be able to see his baby, and I told him I felt certain that he is gonna be able to.

STOMSVIK: I wouldn't see why not.

**[5]** Overall expressly conditioned Brown's ability to be with his child on his compliance with her questioning, saying "I want to see you be able to be with that child and have a life, but only the truth is going to take you to that place." Likewise, she said, "I want you to be there for your baby, and what's gonna take you there is the truth. The truth is what's gonna let you be there for your baby . . . ." Rather than heed the warnings in *Haynes, Lynum* and *Tingle* to tread cautiously around the subject of familial attachments, Overall "deliberately prey[ed] upon," *Tingle*, 658 F.2d at 1336, Brown's expression of his overwhelming desire to witness his child's birth. In light of Brown's limited education (he had not completed high school), relative youth (twenty-one years), and lengthy custodial interrogations, the totality of the circumstances reveal that Brown's admissions were involuntary.

**[6]** Were this case on direct review, the above analysis would likely lead us to conclude that Overall's tactics were coercive under *Haynes*, *Lynum* and *Tingle* and that his admissions should therefore have been suppressed. The question before us on habeas review, however, is not whether we believe the state court's determination to be erroneous—which we do—but whether it is unreasonable in light of clearly established Supreme Court law. *See Williams*, 529 U.S. at 411 ("[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."). As the Supreme Court has recently noted, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). It is this exceedingly high bar that Brown fails to meet.

**[7]** Other courts considering the effect of leveraging a suspect's familial affections on the voluntariness of that suspect's confession have not unanimously concluded that *Haynes* and *Lynum* compel a rule that exploiting an accused's relationships to induce cooperation renders the resulting confession involuntary. In *United States v. Mendoza-Cecelia*, the Eleventh Circuit upheld the admission of a confession obtained after customs officials told the defendant that "something can happen to your family" if he did not confess. 963 F.2d 1467, 1475 (11th Cir. 1992), *abrogated on other grounds by Coleman v. Singletary*, 30 F.3d 1420 (11th Cir. 1992). Similarly, in *United States v. Charlton*, the Sixth Circuit affirmed the trial court's admission of a confession obtained after police told the defendant that they had arrested his son and that, if he wanted to keep his son "out of the case," the defendant would have to confess. 565 F.2d 86, 88 (6th Cir. 1977). The Sixth Circuit reasoned that, absent any other indica of coercion, the defendant's confession was merely a rational and voluntary decision to protect his son. *Id.* at 89; *see also United States v. Jones*, 32 F.3d 1512, 1517 (11th Cir. 1994)

(per curiam) (finding "no coercion" in law enforcement's comment to defendant that his girlfriend "would continue to be considered a suspect" unless defendant explained her participation); *United States v. Ponce Munoz*, 150 F. Supp. 2d 1125, 1135-36 (D. Kan. 2001) (concluding that "officers' discussion of realistic penalties for cooperative and non-cooperative defendants does not render the defendant's confession . . . involuntary," and admitting confession obtained after police told defendant that they had probable cause to arrest defendant and his wife, leaving defendant's child in custody of the state). *But see United States v. Finch*, 998 F.2d 349, 356 (6th Cir. 1993) (finding confession to be involuntary where police made baseless threats to arrest members of suspect's household because "threats to arrest members of a suspect's family may cause a confession to be involuntary").

**[8]** These cases reveal that lower federal courts do not always interpret *Lynum* to mean that threats or promises relating to one's children or family warrant special caution, as we have in *Tingle*, but only that such threats or promises may be considered as part of the totality of the circumstances. In light of these differences, we cannot say that there is "no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington*, 131 S.Ct. at 786. We therefore affirm the district court's denial of Brown's habeas corpus petition on the ground of the admission of involuntary statements.

## B. Right to Present a Complete Defense

**[9]** Brown next contends that the exclusion of Dr. Ofshe's testimony violated his constitutional right to present a complete defense. *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986). The trial court excluded Dr. Ofshe's testimony under California Evidence Code § 801, which states that experts may only be permitted to testify on matters "sufficiently beyond common experience that the opinion of an expert

would assist the trier of fact." The appellate court upheld that ruling.

This case is analogous to *Moses v. Payne*, 555 F.3d 742 (9th Cir. 2009). There, a defendant on trial for murder attempted to introduce the testimony of an expert witness who specialized in depression and who would have testified that the victim exhibited a number of risk factors for suicide, supporting the defense that the defendant was not guilty of murder because the victim killed herself. *Id*. at 749. The state trial court did not dispute the witness's qualification as an expert but nevertheless excluded the testimony under Rule 702 of the Washington Rules of Evidence as within the province of the jury, as cumulative, and as more prejudicial than probative. *Id*. at 750. The defendant challenged that ruling in state appellate court, lost, and sought habeas relief in federal district court. *Id*. The district court denied the petition, and we affirmed. *Id*. We considered the defendant's challenge to the state court's discretionary exclusion of the expert in light of Supreme Court precedent on the intersection of constitutional rights and state evidentiary rules, concluding as follows:

> [T]he Supreme Court's cases have focused only on whether an evidentiary rule, by its own terms, violated a defendant's right to present evidence. These cases do not squarely address whether a court's exercise of discretion to exclude expert testimony violates a criminal defendant's constitutional right to present relevant evidence. Nor do they clearly establish "a controlling legal standard" for evaluating discretionary decisions to exclude the kind of evidence at issue here. Therefore, the state appellate court's determination that the trial court's exercise of discretion to exclude expert testimony under Rule 702 did not violate Moses's constitutional rights cannot be contrary to or an unreasonable application of clearly established Supreme Court precedent.

*Id*. at 758-59 (citations omitted).

**[10]** Between the issuance of *Moses* and the present, the Supreme Court has not decided any case either "squarely address[ing]" the discretionary exclusion of evidence and the right to present a complete defense or "establish[ing] a controlling legal standard" for evaluating such exclusions. Brown, therefore, cannot—as the petitioner in *Moses* could not—show that the state appellate court's ruling was either contrary to or an unreasonable application of clearly established Supreme Court precedent. We, therefore, affirm the district court's denial of Brown's petition for a writ of habeas corpus for the violation of his right to present a complete defense.

## V. CONCLUSION

**[11]** Under the "highly deferential standard" that we must apply to the state appellate court's determinations under AEDPA, *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997), Brown's petition for a writ of habeas corpus was correctly denied. Neither the state court's rulings on the constitutionality of the admission of Brown's confession nor the constitutionality of the exclusion of Dr. Ofshe's testimony are contrary to or an unreasonable application of clearly established Supreme Court law. Accordingly, we AFFIRM.