**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

TYMOND J. PRESTON,
*Defendant-Appellant*.

No. 11-10511

D.C. No.
3:10-cr-08026-
GMS-1

ORDER AND
AMENDED OPINION

Appeal from the United States District Court
for the District of Arizona
G. Murray Snow, District Judge, Presiding

Argued and Submitted
November 9, 2012—San Francisco, California

Filed February 5, 2013
Amended February 27, 2013

Before: Jerome Farris, John T. Noonan, and
Jay S. Bybee, Circuit Judges.

Order;
Opinion by Judge Farris;
Dissent by Judge Noonan

# SUMMARY[*]

## Criminal Law

The panel affirmed a conviction for abusive sexual contact and remanded for resentencing in a case in which the district court imposed a lifetime term of supervised release and several conditions of supervised release.

The panel held that the defendant's confession was properly admitted. The panel wrote that the defendant's diminished mental capacity alone is not enough to render his confession involuntary, and that the length, location, and continuity of the interview do not support a conclusion of involuntariness.

The panel held that the defendant validly waived his rights to a jury trial and an indictment, and the district court did not plainly err by accepting the defendant's counsel's waiver of his right to confrontation.

The panel rejected the defendant's contention that the district court abused its discretion in admitting expert testimony about the DNA evidence used to implicate him.

The panel held that the district court properly admitted the testimony of the victim's grandmother and uncle under the excited utterance exception to the general hearsay exclusion. The panel held that the improper admission of an investigating officer's hearsay testimony was cumulative to

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

admissible testimony and therefore harmless. The panel rejected the defendant's argument that prosecutorial misconduct materially affected the fairness of the trial.

The panel rejected the defendant's sufficiency-of-the-evidence challenge to the conviction.

The panel held that the district court's imposition of a lifetime term of supervised release was procedurally sound. Regarding substantive reasonableness, the panel could not, on this record, hold that the district court abused its discretion, but suggested that the district court, in its own discretion, consider the prosecutor's recommendation of an alternative sentence, whereby the defendant, who is in his early twenties, may satisfy some requirements to have the term shortened.

The panel directed the district court on remand to reconsider a supervised release condition requiring plethysmograph testing as to which the district court failed to make the requisite specific findings.

The panel directed the district court to clarify a condition that the defendant "shall not possess, view, or otherwise use any other material that is sexually stimulating, sexually oriented, or deemed to be inappropriate by the probation officer and/or treatment provider."

The panel requested that the district court include a mens rea requirement in a condition prohibiting the defendant from being "in the company of . . . children under the age of 18 without prior approval of [his] probation officer." The panel also instructed the district court to explain adequately its reasons for imposing this condition, or to narrow it appropriately, given that the condition infringes on a

significant liberty interest by prohibiting the defendant from associating, without the permission of his probation officer, with any children of his own he may have in the future.

Judge Noonan dissented because the only evidence against the defendant is a coerced confession. He also wrote that he would ban the plethysmograph procedure altogether.

## COUNSEL

Professor Keith Swisher, Phoenix Arizona, for the Defendant-Appellant.

Michael T. Morrissey, Assistant United States Attorney for the District of Arizona; Ann Birmingham Scheel, Acting United States Attorney for the District of Arizona; Karla Hotis Delord, Acting Deputy Appellate Chief for the District of Arizona; and Bridget S. Bade, Assistant United States Attorney, Phoenix, Arizona for the Appellee.

## ORDER

The opinion filed on February 5, 2013 is amended as follows:

On slip Opinion page 26, lines 7–10, remove the following text: [Preston failed to move for acquittal at the close of the evidence, so we reverse only for plain error. *United States v. Delgado*, 357 F.3d 1061, 1068 (9th Cir. 2004).]

On slip Opinion page 26, line 12, change the following text: [any] to [*any*]

On slip Opinion page 26, line 14, change the following text: [*Id.* (citations and emphasis omitted).] to [*Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *United States v. Atkinson*, 990 F.2d 501, 503 (9th Cir. 1993) (en banc).]

On slip Opinion page 27, line 1, change the following text: [reasonable] to [rational]

On slip Opinion page 27, line 13, change the following text: [reasonable] to [rational]

On slip Opinion page 27, lines 13–14, change the following text: [*Delgado*, 357 F.3d at 1068.] to [*Jackson*, 443 U.S. at 319.]

---

**OPINION**

FARRIS, Senior Circuit Judge:

Tymond Preston appeals his conviction for Abusive Sexual Contact in violation of 18 U.S.C. §§ 1153 and 2244, and contests the portion of his sentence imposing a lifetime term of supervised release and several conditions of his supervised release.

After a minor's allegations of sexual assault and an investigation, Preston was indicted for Aggravated Sexual Abuse. The government later agreed to dismiss the indictment and filed an information charging Preston with Abusive Sexual Contact. Preston was convicted after a bench trial.

## I.

At some time in the evening on Wednesday, September 23, 2009, TD[1], an eight-year-old boy, entered Tymond Preston's home; Preston was eighteen.  TD and Preston were neighbors and relatives, though their families were involved in a feud.  What happened inside Preston's house, as well as the exact time of the event, are disputed.  According to the prosecution, Preston placed a condom on his penis and inserted it into TD's anus for several seconds before TD ran out the door and began to cry.  The defense expresses doubt that this assault occurred.  While the investigating agents believed that the assault took place around 6:30 p.m., the defense argues that it occurred earlier, if at all, relying in part on a clerical error made by a hospital nurse who wrote "16:30" on one of her reports but really meant to write "18:30"; she simply confused the military time conversion.

After exiting Preston's house in tears, TD joined his two young cousins.  The three boys entered TD's house at around 8:00 p.m., all crying and visibly upset.  TD's grandmother asked him why he was upset and he replied that his "butt" hurt because Preston had put his penis in his "butt."  TD's grandfather called the police to report the incident, and the police advised him to take TD to the hospital.  On the way to the hospital, TD refused to sit "because his butt was hurting." At the hospital, an officer arranged for TD's family to take him to the Safe Child Center at the Flagstaff Medical Center the following day.

---

[1]    This case involves a juvenile victim whose identity has been protected.

TD met with a forensic interviewer at the Safe Child Center, who gave TD an opportunity to communicate what had happened to him. TD repeated his statement that "[Preston] put his penis in my butt and it hurts." When pressed for more details, TD told the interviewer a long and convoluted story involving multiple assaults by Preston—including statements that Preston had ejaculated onto his shirt and mouth, neither of which was evidenced in TD's subsequent examination—, police chases, helicopters, monster trucks, and other apparently fabricated events. Notably, the story included TD's account of Preston sexually assaulting TD's sister, specifically "[t]rying to fuck her butt," and TD's account of his own use of throwing knives to attack Preston and "robbers"—none of which is corroborated by additional evidence. According to the forensic interviewer, children commonly use diversionary techniques to avoid providing details about their sexual assault, and these techniques include projecting their victimization onto another person and describing acts of aggression against their attackers.

While at the Safe Child Center, a nurse practitioner conducted a "head-to-toe" medical examination of TD. TD told the nurse that "[Preston] put his dick in my butt," that Preston put on a "dick wearing," which the nurse took to mean a condom, and that the condom "got white stuff on it. [Preston] threw it away." The nurse noted that TD had no body surface injuries, complained of pain when she examined his anus, and had a "normal genital and anal exam," though the nurse noted that a "normal exam does not confirm nor negate the possibility of abuse."

Two agents began an investigation and drove to Preston's house to interview him. They approached Preston outside of

his home, told him that they were there to discuss the allegations of sexual assault, and engaged him in a forty-minute, tape-recorded interview. Other people familiar to Preston were nearby during the interview. The agents informed Preston that he was not under arrest and was free to leave. Preston appeared calm throughout the interview and seemed to understand the agents' questions. Although the alleged assault took place on Wednesday, September 23, the agents variously referred to the date of the incident as the 23rd, or Friday, or both. When asked if he was at home on Friday, Preston replied that he was not at home and "was around downtown." Preston was, in fact, not home that Friday. The agents used such tactics as telling Preston that "six people over there" could place TD at Preston's home on the day of the incident, telling him about other evidence such as "forensic exams [and] interviews" that could be used, and asking him if this was a "one-time thing" or if he "prey[ed] on little kids." Preston still denied having done anything to TD. Preston also claimed that he could not remember "Friday" because he suffered from "short-term memory loss," telling the agents, "sometimes I go crazy." Preston claimed, "It's just like I have problems with my head, like a tumor." One of the agents asked him, "You have a tumor?" and Preston responded, "Yeah." An agent then asked if he was disabled, and Preston asked the agent to explain what "disabled" means. The agent explained what he meant by disabled—whether Preston was "not able to take care of" himself or get a job—and Preston replied that he had been removed from school for his behavior and was not allowed back.

The agents continued their questioning and Preston kept denying the accusations. One agent offered Preston the chance "to sit in the [agents'] vehicle and talk about it away

from . . . everybody." Preston declined. They again reminded Preston that he was not under arrest and was free to leave. They told Preston that he seemed like a "pretty good dude" and that if he felt sorry, he should confess. They also told Preston, "We don't tell this to anybody. It stays with the folder, and it stays with the U.S. Attorney's Office and that's it." Preston admitted that TD came into his house that day, but still insisted that he "didn't do nothing" and suggested that someone was trying to "frame" him. Finally, the agents again informed him that their "previous investigation" revealed that "[s]omething did happen," and when they asked if he used a condom, he nodded his head and said, "That's it. Just came in, and it just happened." The agents then asked Preston a series of questions about the event. To many of these questions, like "He pulled his pants down? And then what did he say?" and "You just unzipped your zipper?" Preston would respond, "I don't know" and claim that he could not remember the events. The agents asked many leading questions, for example, "did he pull his pants down or what did he do?" and "did he put the condom on or did you?" The agents asked Preston, "Did you just put your—put your penis in all the way or just a little bit?" to which he responded, "Just a little bit." He admitted that he put his penis in TD's anus for "five, six seconds . . . then [TD] went out . . . said, I'm going to tell on you, and then he just fucking started crying." He also claimed that he did not ejaculate. When asked why he did it, Preston claimed that he did not have a sexual "urge" to do it, and that TD was the one who came onto him; he claimed that TD was "always saying . . . suck my dick . . . and he says it to all these other kids, too."

The agents then asked Preston if he was sorry for what he had done to TD. When he said that he was, the agents told him, "[U]sually what we do is we write a statement and like

if you wanted to say you're sorry or something like that, you could . . . definitely do that, and we can provide that to him." The agents asked Preston if they could "just summarize what [Preston] . . . told [them]." At this point, the agents realized that the alleged incident had not occurred on Friday and erroneously changed the day in their summary to Thursday, but correctly stated that it was the 23rd of September. The agents wrote down a summary of the events. They asked Preston to repeat his account and included what Preston could confirm happened and left out that which Preston claimed he could not remember. They explained that they were "not going to put anything that [he didn't] want [them] to put in," and that they were "going to have [him] sign [it]." They then gave it to Preston to read over and told him that he could "change anything [he] want[ed]." Preston then signed the statement without making changes and the agents left without placing him under arrest.

Preston was initially charged by indictment with Aggravated Sexual Abuse, for which the mandatory minimum prison sentence is thirty-years. Negotiations between Preston, his attorney, and the government led to an agreement that Preston would waive his rights to a jury trial and to an indictment if the government would reduce his charge to the lesser offense of Abusive Sexual Contact, which carries no maximum prison sentence, and would recommend that he receive no more than a fifteen-year sentence. Preston and his attorney signed and filed a waiver of indictment and a waiver of jury trial, both of which stated that Preston had been advised of his rights and agreed to waive them in open court. Additionally, the district court conducted a colloquy in open court to determine whether Preston understood the rights that he waived. The judge, with assurances from

Preston's attorney, concluded that Preston understood his rights.

The district judge conducted a three-day bench trial and at its conclusion found Preston guilty of the charge. The court relied on Preston's confession, DNA evidence taken from TD's underwear and an expert witness's analysis of the DNA, TD's statements to his grandmother, and the testimony of TD's forensic interviewer and the nurse who conducted his medical examination. TD did not testify at the trial, though his recorded statements were admitted by stipulation.

The court sentenced Preston to fifty-months' imprisonment, a lifetime term of supervised release, and, *inter alia*, the conditions that:

> (1) "You shall attend and participate in plethysmograph testing," (2) "You shall not possess, view, or otherwise use any other material that is sexually stimulating, sexually oriented, or deemed to be inappropriate by the probation officer and/or treatment provider," and (3) "You shall not be in the company of or have contact with children under the age of 18 without prior approval of the probation officer."

## II.

Preston raises several issues in challenging his conviction and sentence. Preston first argues that his confession was involuntary and thus improperly admitted at trial. After examining the totality of the circumstances, we conclude that the confession was properly admitted. Preston also

challenges the validity of his waiver of his rights to a jury trial, indictment, and confrontation. We hold that Preston validly waived his rights to a jury trial and an indictment, and the district court did not plainly err by accepting Preston's counsel's waiver of his right to confrontation. We reject Preston's contention that the trial court abused its discretion in admitting expert testimony about the DNA evidence used to implicate him.

We hold that the district court properly admitted the testimony of TD's grandmother and uncle under the excited utterance exception to the general hearsay exclusion. The testimony of Officer Butler was not properly admitted at trial, but its admission was harmless error. We reject Preston's argument that prosecutorial misconduct materially affected the fairness of the trial. Preston also argues that the trial court relied on insufficient evidence. We reject the argument. Since certain conditions of Preston's supervised release must be remanded to the district court for reconsideration, we do not rule on the question of the duration of the supervision.

## III.

We review de novo whether a confession was voluntary and for clear error the district court's factual findings underlying its determination of voluntariness. *United States v. Gamez*, 301 F.3d 1138, 1144 (9th Cir. 2002).

"Involuntary or coerced confessions are inadmissible at trial because their admission is a violation of a defendant's right to due process." *Brown v. Horell*, 644 F.3d 969, 979 (9th Cir. 2011). "[C]ourts look to the totality of circumstances to determine whether a confession was voluntary." *Withrow v. Williams*, 507 U.S. 680, 693 (1993). Factors to be

considered in this analysis include "the degree of police coercion; the length, location and continuity of the interrogation; and the defendant's maturity, education, physical condition, mental health, and age." *Brown*, 644 F.3d at 979 (citing *Withrow*, 507 U.S. at 693–94). Ultimately, the determination to be made is whether the "suspect's will was overborne." *Haynes v. Washington*, 373 U.S. 503, 513–14 (1963).

"[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). "Coercive police activity can be the result of either 'physical intimidation or psychological pressure.'" *Brown*, 644 F.3d at 979 (quoting *Townsend v. Sain*, 372 U.S. 293, 307 (1963)). Here, the agents did not threaten Preston physically nor use any improper interview techniques to apply "psychological pressure." *See Brown*, 644 F.3d at 979. The interview lasted about forty-minutes, took place outside of Preston's residence, others were nearby, Preston was told multiple times that he was not under arrest and was free to leave, Preston was not physically restrained, and the agents did not arrest Preston at the conclusion of the interview. Preston's assertion that the agents' offer to speak inside their vehicle "subtly threatened his physical freedom" is unfounded; the agents offered this opportunity to allow Preston to "talk about it away from . . . everybody," Preston declined the offer, and the agents reminded Preston immediately thereafter that he was not under arrest.

There is no doubt that the agents continued to try to obtain a confession from Preston after he denied the incident with TD. However, accusing a suspect of lying "does not automatically render the questioning coercive, as an

interrogator can legitimately express his disbelief at a defendant's story in order to elicit further comments or explanations." *United States v. Wolf*, 813 F.2d 970, 975 (9th Cir. 1987).

Nor is there any doubt that the agents confused the dates during the course of the interview. However, this was not a ploy to confuse Preston, but was a genuine mistake on the part of the investigating agents; the agents properly referred to the incident as having occurred on September 23 and eventually tried to rectify the mistake during their interview with Preston, though once again they stated the wrong day. This mistake did not appear to confuse Preston, who continued to deny having been home on Friday but eventually acknowledged the incident to which the agents were referring. It would be illogical to expect Preston to correct the agents' asserted date of an event he claimed never occurred, and by the time he began to confess, differentiating between a Wednesday and a Friday would not have been at the forefront of his thoughts.

The agents proceeded with their interview by using such tactics as telling Preston that other evidence could implicate him, making it seem as though confessing could minimize the consequences of his crime, and asking Preston suggestive questions. None of these tactics, however, rises to a constitutional violation. The agents did not use "false evidence ploys," as implied by Preston. The agents referenced witnesses that could place TD at Preston's home on the day of the incident, interviews implicating Preston, and forensic examinations that could be conducted to determine what had occurred. There *were* several people who could place TD at Preston's home on the day of the incident, the agents *had* reports of the incident from other interviews, and

a forensic examination of TD *could* be conducted, as it later was. Even if this evidence was misleading, this is not enough to amount to coercion. *See Pollard v. Galaza*, 290 F.3d 1030, 1034 (9th Cir. 2002) ("[M]isrepresentations made by law enforcement in obtaining a statement, while reprehensible, does not necessarily constitute coercive conduct."). Similarly, the agents' statements to Preston that his confession could stay between them and the United States Attorney, and that they could possibly get help for him if he confessed, were not improper. Agents may use such tactics to induce a confession. *See United States v. Coleman*, 208 F.3d 786, 791 (9th Cir. 2000) (Agents' promise that they could "tell the prosecutor to give [the suspect] little or no time" did not establish involuntariness). Finally, the agents' use of suggestive questions was not improper. It is not reasonable to expect a person suspected of perpetrating a serious crime to willingly provide a narrative of his criminal action. *See Doody v. Ryan*, 649 F.3d 986, 1021 (9th Cir. 2011) ("We recognize and acknowledge that police officers are entitled to use, and do use, a variety of techniques to interrogate suspects."); *Cunningham v. City of Wenatchee*, 345 F.3d 802, 810 (9th Cir. 2003) (finding that "continuing to question a suspect after the suspect claims he is innocent does not constitute coercion and is often necessary to achieve the truth," and though the questions may have "unsettled" the suspect, "mere emotionalism and confusion do not invalidate confessions"). Preston's denial of some suggestions by the agents and his acceptance of others suggests that his will was not overborne by the agents' strategy. Preston also provided the agents with additional facts that were not suggested by their leading questions; for example, his statements regarding how long he placed his penis in TD's anus and TD's reaction thereafter.

Further, tactics used to obtain a confession are only a factor to be weighed when examining the totality of the circumstances. *Brown*, 644 F.3d at 979. The length, location, and continuity of the interview do not support a conclusion of involuntariness.

Preston contends that a finding of involuntariness is "irrefutable in light of [his] characteristics," specifically his diminished mental capacity. The "personal characteristics of the defendant are constitutionally irrelevant absent proof of coercion," *Derrick v. Peterson*, 924 F.2d 813, 818 (9th Cir. 1991) (quoting *United States v. Rohrbach*, 813 F.2d 142, 144 (8th Cir. 1987)) (internal quotation marks omitted). Preston's diminished mental capacity does not so heavily influence the totality of circumstances test that a finding of involuntariness is appropriate.

Preston has an IQ of 65, which means that he suffers from mild mental retardation. *Atkins v. Virginia*, 536 U.S. 304, 309 n.3 (2002) ("'Mild' mental retardation is typically used to describe people with an IQ level of 50–55 to approximately 70."). Preston argues that the agents should have known that he was disabled and taken precautionary steps during their interview and, "at least, given him *Miranda* warnings." Preston presents a valid argument that the agents should have had some idea that he suffered from mental issues, but it could not have been clear to the agents exactly what issues those were. Preston informed the agents that a "tumor" caused "short-term memory loss," and that he had been removed from his high school due to his behavior and not allowed back. Neither of these comments would give the officers reason to believe that Preston could not comprehend their questions or would be susceptible to improper influence. Additionally, Preston's contention that the agents should have

provided him with *Miranda* warnings or required a parent or attorney to be present are legally baseless. Preston was not in custody and makes no argument that he was. *Withrow v. Williams*, 507 U.S. 680, 693–94 (1993) (taking into consideration in its due process analysis of voluntariness the "failure of police to advise the defendant of his rights to remain silent and to have counsel present during *custodial interrogation*." (emphasis added)); *Derrick*, 924 F.2d at 819 ("[N]o case . . . requir[es] that a juvenile's relative be present prior to any confession."). Moreover, Preston was not a juvenile.

Finally, the bar for finding that a defendant was coerced in part due to his mental impairment is not insignificant and appears to turn largely on the length of the interrogation. *See, e.g.*, *Columbe v. Connecticut*, 367 U.S. 568, 620–26 (1973) (noting that mental incapacity was a relevant factor in determining that holding the defendant—a "mental defective . . . with an intelligence quotient of sixty-four"—in effective police custody for four nights and five days, refusing to let the defendant speak with anybody other than his co-defendant and wife, and repeatedly questioning the defendant culminating in a four-and-a-half hour questioning after which he confessed, was coercive); *Doody v. Ryan*, 649 F.3d 986, 1008 (9th Cir. 2011) (focusing on time as an important factor in concluding that a twelve-hour investigation of a mentally impaired suspect was coercive); *Com. of N. Mariana Islands v. Mendiola*, 976 F.2d 475, 485–86 (9th Cir. 1992) (determining that the interrogation of a cognitively impaired defendant was coercive when "[p]olice repeatedly informed Mendiola that he would be charged or released within twenty-four hours, they interrogated him on numerous occasions without affording him the comfort of friends, family, employer, or attorney, they repeatedly accused him of lying,

and they instructed him to sign statements he could not understand"), *overruled on other grounds by George v. Camacho*, 119 F.3d 1393 (9th Cir. 1997). Finding unconstitutional coercion here, where the interrogation consisted of forty-five minutes of questioning in Preston's own driveway, would significantly broaden this Court's coercion jurisprudence, at least as it impacts those with cognitive impairments.

Preston's mental capacity alone is not enough to render his confession involuntary. In the absence of coercive tactics or a coercive atmosphere during the interview, more is required to show that Preston's confession was involuntary.

## IV.

We review de novo the district court's acceptance of a defendant's waiver of his rights to a jury trial and an indictment. *United States v. Christensen*, 18 F.3d 822, 824 (9th Cir. 1994); *see United States v. Ferguson*, 758 F.2d 843, 850–51 (2d Cir. 1985). "If the defendant failed to object to the admission of evidence under the Confrontation Clause, [this Court] review[s] for plain error." *United States v. Hagege*, 437 F.3d 943, 956 (9th Cir. 2006).

### A. Waiver of Indictment

A defendant must knowingly, intelligently, and voluntarily waive his right to an indictment. *Ferguson*, 758 F.2d at 850–51. Federal Rule of Criminal Procedure 7(b) allows a defendant to waive his right to an indictment and be charged by information if the defendant waives the right "in open court and after being advised of the nature of the charge and of [his] rights." FED. R. CRIM. P. 7(b).

Preston's waiver complied with Rule 7(b). Preston waived his right in open court after the district judge ascertained Preston's understanding of the consequences, and Preston's lawyer confirmed that Preston understood the waiver. The judge explained to Preston the difference between an indictment and an information, including the role of the grand jury in an indictment and the consequences of waiving his right to a grand jury indictment. The judge also asked Preston's attorney whether he had reservations about Preston's understanding of his waiver, and the attorney stated, "I have no such reservations, judge." Preston's attorney had consulted with two mental health professionals, both of whom confirmed that while Preston may have been slow to understand the concepts involved in the court proceedings, he was capable of understanding them, and the attorney spent several hours with Preston explaining to him the concept and consequences of his waiver.

Preston also argues that his waiver in exchange for a lesser sentence constituted coercion. There is, however, no basis in law or fact for this argument. Preston knowingly, intelligently, and voluntarily waived his right to an indictment.

**B. *Waiver of Jury Trial***

A defendant "must be competent to waive the jury right, and the waiver must in fact be voluntary, knowing, and intelligent." *Christensen*, 18 F.3d at 824. Federal Rule of Criminal Procedure 23(a) allows criminal defendants to waive their constitutional right to a jury trial if the waiver is made in writing and has the approval of the government and of the court. FED. R. CRIM. P. 23(a). This Court has also held that in "cases where the defendant's mental or emotional state

is a substantial issue," the district court must conduct "an in-depth colloquy which reasonably assures the court that under the particular facts of the case, the signed waiver was voluntarily, knowingly, and intelligently made." *Id.* at 825–26. This must include telling the defendant: "(1) twelve members of the community compose a jury; (2) the defendant may take part in jury selection; (3) jury verdicts must be unanimous; and (4) the court alone decides guilt or innocence if the defendant waives a jury trial." *Id.* at 825.

Preston complied with Federal Rule of Criminal Procedure 23(a) by waiving his right to a jury trial in writing and with the approval of the government and the court. The judge conducted an in-depth colloquy in which he discussed with Preston each of the four aforementioned points, had Preston explain each, and made sure that Preston understood them all. Preston's argument that the court was required to comply with Federal Rule of Criminal Procedure Rule 11, which sets forth necessary procedural steps for a defendant accepting a guilty plea, has no legal basis because Preston did not plead guilty. Preston's waiver of his jury right was voluntary, knowing, and intelligent.

## C.  *Waiver of Right to Confrontation*

"[T]he accused may waive his right to . . . confrontation and . . . the waiver of this right may be accomplished by the accused's counsel as a matter of trial tactics or strategy." *Wilson v. Gray*, 345 F.2d 282, 286 (9th Cir. 1965). At trial, Preston and his attorney agreed to admit TD's recorded statement in lieu of having TD testify in person, and he argues that this stipulation violated his right to confrontation. It is clear that the trial counsel's stipulation was a matter of trial strategy. Preston's attorney opted to admit the recorded

statements because he was content with the information contained therein and concerned that "children on the stand . . . can say anything and go in any direction." The district court did not plainly err by accepting this waiver and admitting TD's recorded statements. *See Hagege*, 437 F.3d at 956.

## V.

Preston argues that the expert testimony of the DNA analyst at trial did not meet the requirements of Rule 702 and should have been excluded as unfairly prejudicial under Federal Rule of Evidence 403.

Preston's assertion that the DNA evidence should have been excluded under Rule 403 depends largely on his argument that the evidence was unreliable. His argument fails. Rule 403 is inapplicable to bench trials. *EEOC v. Farmer Bros. Co.*, 31 F.3d 891, 898 (9th Cir. 1994); *Schultz v. Butcher*, 24 F.3d 626, 632 (4th Cir. 1994).

Federal Rule of Evidence 702 states that expert testimony must be "the product of reliable principles and methods, and . . . the expert [must have] reliably applied the principles and methods to the facts of the case." FED. R. EVID. 702. We review the district court's decision to admit expert opinion testimony for abuse of discretion. *United States v. Redlightning*, 624 F.3d 1090, 1110 (9th Cir. 2010). Whether a district court abused its discretion involves a two-step inquiry. *Id.* "First, we determine de novo whether the district court identified the correct legal rule to apply to the relief requested. If the district court did not identify the correct legal rule, it is an abuse of discretion. Second, we determine if the district court's application of the correct legal

standard was illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *Id.* (internal citations omitted).

The district court properly applied Rule 702 to determine whether to admit the testimony of the DNA analyst. The trial judge fulfilled his "gatekeeper" role pursuant to *Daubert* and allowed the expert's testimony based on the foundation laid by the prosecutor that established the relevance and reliability of the testimony and the scientific method by which the DNA was analyzed; the DNA was subjected to a common procedure for analysis. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Preston made no objection to the expert's testimony at trial and has failed to articulate any meaningful reason that her analysis is not reliable. For example, Preston argues that the "analyst went below her lab's quality threshold." However, the expert explicitly stated that while the test conducted may have fallen below the lab's "reporting threshold," the analysts are "allowed to go below that level to try and eliminate or exclude someone." This is exactly what the expert did. Preston's other arguments attack the analyst (1) for running "irrelevant statistical hypotheses," even though the tests to which he refers were not part of the analyst's report and were not relied on by the district court, and (2) for using inappropriate population statistics, even though Preston's expert agreed that these statistics were proper to use in an analysis.

Preston incorrectly asserts that the district court "erroneously used the DNA population statistics." Specifically, Preston claims that the district court misinterpreted the DNA evidence when it stated that "99.8% of the general Navajo population can be excluded as possible contributors of such DNA." The analyst testified that "99.8

percent of Navajo contributors" taken from a "population of randomly selected unrelated individuals" could be eliminated as contributors to the DNA found in TD's underwear. Preston claims that "the 99.8% statistic suggests only that this percentage of randomly selected, unrelated Navajo Native Americans is unlikely to have the exact same DNA profile as Mr. Preston—the presence or absence of alleles at only five loci would yield a significantly lower percentage." Preston, however, has misinterpreted the analyst's statistics; the analyst eliminated 99.8% of the Navajo population based on an analysis of the sample taken from TD's underwear and not based on an analysis of Preston's DNA, and Preston provides no basis for his claim that another test, which he fails to describe, "would yield a significantly lower percentage." The district court did not abuse its discretion in admitting the expert's testimony. It applied the correct rule, Rule 702, and did not apply the rule in a way that was "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *Redlightning*, 624 F.3d at 1110.

## VI.

We review a district court's admission of evidence for an abuse of discretion and will reverse only if it is more probable than not that the improper evidence materially affected the verdict. *United States v. Dorsey*, 677 F.3d 944, 951, 954 (9th Cir. 2012). Alleged Confrontation Clause violations are reviewed de novo and are subject to harmless error analysis. *United States v. Berry*, 683 F.3d 1015, 1020 (9th Cir. 2012).

Preston objects to the district court's admission of testimony from TD's grandmother and uncle recounting what TD told them on the night of the assault. He also challenges

the testimony of Officer Butler, who investigated the incident, recounting what TD and his grandparents told him about the assault.

The district court did not abuse its discretion by admitting the statements of TD's uncle and grandmother recounting what TD told them on the night of the assault. The excited utterance exception allows a court to admit a "statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." FED. R. EVID. 803(2). Although Preston claims that the timing of the events precludes admission of the testimony, there is no conclusive evidence to establish when the alleged assault occurred, and the evidence shows that TD ran from Preston's house in tears to his own home where he reported the incident to his relatives while still crying and visibly upset. The district court did not abuse its discretion. It did not make a decision that was "clearly against the logic and effect of the facts." *Rabkin v. Oregon Health Sciences Univ.*, 350 F.3d 967, 977 (9th Cir. 2003). These statements did not violate the Confrontation Clause. Excited utterances are nontestimonial. *Leavitt v. Arave*, 383 F.3d 809, 830 (9th Cir. 2004).

Preston does make a valid argument that the testimony of Officer Butler was improperly admitted as hearsay and a violation of the Confrontation Clause. However, Officer Butler's testimony was cumulative to the testimony of TD, TD's grandmother and uncle, and TD's forensic interviewer. In light of the other evidence available, the admission of Officer Butler's testimony was harmless error. *See United States v. Gonzalez*, 533 F.3d 1057, 1061–62 (9th Cir. 2008) (admission of hearsay recounting victim's rape story was

harmless error where victim also testified that the defendant had raped her).

## VII.

If defense counsel fails to object to acts of alleged prosecutorial misconduct at trial, we review for plain error. *United States v. Wright*, 625 F.3d 583, 610 (9th Cir. 2010). To obtain reversal, a defendant must establish both misconduct and prejudice. *Id*. Regarding prejudice, the question is whether it is more probable than not that the misconduct materially affected the fairness of the trial. *Id.* at 613.

Preston makes several arguments that the evidence was improperly argued: the prosecutor improperly vouched for the testimony of the DNA analyst; the prosecutor argued chronic sexual abuse; the prosecutor injected "incendiary considerations" into the case; and the prosecutor suggested that defense counsel manufactured evidence, commented on Preston's silence, and called Preston's mother a liar. These arguments lack merit.

"Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony." *United States v. Weatherspoon*, 410 F.3d 1142, 1146 (9th Cir. 2005) (internal citation omitted). Preston is correct that the prosecutor stated that the DNA analyst had "no motive to do anything other than to tell the truth." However, this falls short of vouching. The prosecutor did not make any personal assurances of veracity nor did he make reference to information not presented to the judge. *See Weatherspoon*,

410 F.3d at 1146 (finding that a prosecutor improperly vouched for a witness where the prosecutor went beyond his statement that the witness had no reason to lie and "clearly urged that the existence of legal and professional repercussions served to ensure the credibility of the officers' testimony").

Preston argues that the prosecutor improperly referenced chronic sexual abuse that was "not in evidence" and "unnecessary to the charge." However, TD stated during his forensic interview that Preston assaulted him multiple times, and the information was relevant to an analysis of this interview.

It is unnecessary to address Preston's other arguments. Even if misconduct occurred, Preston has not shown that it is more probable than not that it affected the fairness of the trial. This was a bench trial in which the judge was the trier of fact. The risk of improperly influencing a judge by placing the prestige of the government in favor of or against a witness or swaying the judge with improper evidence is far less than in a jury trial. *See Dedmore v. United States*, 322 F.2d 938, 946 (9th Cir. 1963) ("[I]t is to be presumed, absent a showing to the contrary, that the District Judge considered only material and competent evidence in arriving at his findings of guilt."). Preston has failed to show misconduct or that this alleged misconduct affected the fairness of the trial.

## VIII.

Preston contends that the trial court had insufficient evidence to conclude that he had the intent to sexually abuse TD or that the abuse actually occurred. We must view the evidence "in the light most favorable to the prosecution" and

examine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *United States v. Atkinson*, 990 F.2d 501, 503 (9th Cir. 1993) (en banc).

The government had the burden to prove beyond a reasonable doubt that Preston had the "intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." 18 U.S.C. § 2246(3). "[C]ircumstantial evidence alone can be sufficient to demonstrate a defendant's guilt." *United States v. Cordova Barajas*, 360 F.3d 1037, 1041 (9th Cir. 2004). Preston's argument that there was insufficient evidence to prove he had the requisite intent depends largely on Preston's own statement that he did not have a sexual "urge" at the time of the assault. Other evidence, however, shows that Preston assaulted TD to gratify his sexual desire, including TD's testimony that he viewed pornography with Preston and that Preston ejaculated after the assault. Preston fails to show that, when viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could not have found the necessary intent beyond a reasonable doubt.

Preston also argues that the evidence is not sufficient to prove that any sexual contact occurred. Preston asserts that the district court made its finding based on a coerced confession, an unreliable statement from TD, and unreliable DNA evidence. Preston has failed to prove his assertions regarding the reliability of the evidence, and even if Preston has cast doubt on the ability of any individual piece of evidence to establish guilt conclusively, he has failed to show that the evidence, taken on a whole and viewed in the light most favorable to the prosecution, could not convince a

rational trier of fact that the assault occurred. *Jackson*, 443 U.S. at 319.

## IX.

The length of a term of supervised release is part of the sentence and is reviewed for reasonableness. *United States v. Daniels*, 541 F.3d 915, 921 (9th Cir. 2008). We must consider (1) whether the district court committed significant procedural error, and then (2) the sentence's substantive reasonableness. *Id.* Whether the district court adequately explained its reasons for a sentence is a procedural issue, *United States v. Cherer*, 513 F.3d 1150, 1159 (9th Cir. 2008), reviewed de novo, *United States v. Hammond*, 558 F.3d 1100, 1103 (9th Cir. 2009). If the district court's sentence is procedurally sound, we will review the substantive reasonableness of the sentence for an abuse of discretion. *United States v. Ressam*, 679 F.3d 1069, 1086 (9th Cir. 2012).

The district court's imposition of a lifetime term of supervised release was procedurally sound. The record does not support Preston's assertion that the court "gave no reasons to justify a life sentence." The court gave many reasons including its review of the sentencing factors, the nature of the offense, and Preston's characteristics. *See United States v. Carty*, 520 F.3d 984, 992 (9th Cir. 2008) ("A within-Guidelines sentence ordinarily needs little explanation.").

Preston also argues that the sentence is substantively unreasonable, asserting that the court failed to take into account the sentencing factors provided by 18 U.S.C. § 3553(a). Section 3553(a) states that the court must consider:

> the nature and circumstances of the offense
> and the history and characteristics of the
> defendant . . . [and] shall impose a sentence
> sufficient, but not greater than necessary . . .
> [1] to reflect the seriousness of the offense, to
> promote respect for the law, and to provide
> just punishment for the offense; [2] to afford
> adequate deterrence to criminal conduct; [3]
> to protect the public from further crimes of
> the defendant; and [4] to provide the
> defendant with needed . . . correctional
> treatment in the most effective manner."
> 18 U.S.C. 3353(a).

The district court made explicit reference to section 3553(a) and took these factors into account during sentencing. Preston argues that the sentence was "greater than necessary" because his age, mental impairments, and lack of a prior record should necessitate a lesser sentence. The court accounted for these facts, and Preston's argument is not sufficient to show that the court abused its discretion.

However, the prosecution recommended a lifetime term of supervised release because "the extent of [Preston's] dysfunction" was not clear at the time of the trial. The prosecutor reasoned that "if [at] some later time it becomes clear that he has been rehabilitated . . . he can have that term of supervised release shortened . . . but at no time can Your Honor lengthen the term of supervised release if you don't avail yourself today of the term of lifetime supervised release." We cannot, on this record, hold that the court abused its discretion, but we note that Preston is young and this can possibly be a very long sentence. We therefore suggest that the district court, in its own discretion, consider

the prosecutor's recommendation of an alternative sentence, whereby Preston may satisfy some requirements to have the term shortened.

## X.

Preston failed to object to the conditions of his supervised release. We therefore review his claims for plain error. *United States v. Blinkinsop*, 606 F.3d 1110, 1118 (9th Cir. 2010). "Plain error is (1) an error that (2) is plain, (3) affects substantial rights, and (4) seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* at 1114 n.2.

The district court must provide a defendant with notice before imposing any condition of supervised release not contemplated by the Sentencing Guidelines. *United States v. Cope*, 527 F.3d 944, 953 (9th Cir. 2008). Preston is incorrect in arguing that the court failed to provide notice of its imposition of plethysmograph testing, its prohibition of his use of sexually explicit materials, and its prohibition of his being in the company of children. Each is explicitly mentioned in the presentencing report that Preston's counsel received before sentencing and this is sufficient to provide notice. *See United States v. Lopez*, 258 F.3d 1053, 1055 (9th Cir. 2001) (notice of departure from sentencing guidelines can be found in the presentence report).

Preston also argues that the court did not provide "on-the-record reasons for imposing" plethysmograph testing. The district court failed to make specific findings with regard to this testing. The government admits, as it must, that this was error. We require specific factual findings before ordering this testing because individuals have a "particularly

significant liberty interest in being free from plethysmograph testing." *United States v. Weber*, 451 F.3d 552, 568 (9th Cir. 2006). Given the significance of this interest and the *Weber* court's mandate of a "thorough inquiry" before it can be abrogated, it is not enough to assume that the district court would have ordered the testing had it conducted the inquiry. The government has resolved not to pursue this condition and at oral argument the government recognized and acknowledged the problem. If upon remand the court elects to impose plethysmograph testing, it must comply with *Weber* in justifying its imposition.

Preston also argues that the condition of his release forbidding his use of "sexually oriented" or "inappropriate" materials is vague, such that "men of common intelligence must necessarily guess at its meaning and differ to its application." *United States v. Soltero*, 510 F.3d 858, 866 (9th Cir. 2007). The government argues that the definitions for "sexually oriented" and "inappropriate" materials can be found in the prior condition's reference to 18 U.S.C. § 2256(2). However, the contested provision states that Preston shall not use "any other material"—this is meant to expand on the materials from the prior condition and thus its use of § 2256(2) is inapplicable. These terms are not clearly defined, leaving Preston "to guess about the intended meaning of the terms of his supervised release." *United States v. Sales*, 476 F.3d 732, 737 (9th Cir. 2007). The government admits, as it must, that the portion of the condition prohibiting Preston's use of materials "deemed to be inappropriate by the probation officer" should be excised. To impose this condition, the district court must clarify what material Preston is forbidden to use.

Finally, Preston argues that the condition prohibiting him from being "in the company of . . . children under the age of 18 without prior approval of [his] probation officer" is not sufficiently definite. Company, as a noun, is defined as "the quality or state of being a companion or associate of another." WEBSTER'S DICTIONARY 461 (3d ed. 1976). This Court has concluded that the term "association," when used in similar supervised release conditions, is not vague because mere incidental contacts do not constitute "association." *Soltero*, 510 F.3d at 866 (citing *Arciniega v. Freeman*, 404 U.S. 4, 4 (1971)). The phrase "in the company of," likewise, is not vague. Although this phrase is sufficiently definite, a vagueness issue arises with regard to the latter portion of the condition that specifies that Preston may not be in the company of "children under the age of 18." In *Soltero*, a condition of supervised release prohibited "associat[ion] with any known member of any criminal street gang." 510 F.3d at 865. This Court noted that Soltero's argument "that he [was] expected to know of every gang currently operating on the streets," was undermined by the fact that he could only violate "the condition if the gang member he associate[d] with [was] *known to him* to be a gang member." *Id.* at 867 n.9 (internal quotation and citation omitted). Unlike the condition in *Soltero*, Preston's condition lacks a mens rea requirement, which means that Preston must know the age of every person with whom he comes in contact to comply with this condition. For example, if, unbeknownst to Preston, one of his co-workers happens to be a mature-looking seventeen-year-old, Preston would be in violation of the terms of his release. Therefore, we request that the district court, on remand, include a mens rea requirement in this condition.

This supervised release condition also raises a problem in light of this Court's recent decision in *United States v. Wolf*

*Child*. 699 F.3d 1082 (9th Cir. 2012). In *Wolf Child*, this Court invalidated a condition of supervised release that prohibited a sexual offender from being "in the company of any child under the age of 18," in part because the Court determined that the condition was overbroad. *Id.* at 1088. This Court opined that "such [a] broad prohibition[]" was not "reasonably limited to the goals of deterrence, protection of the public, or rehabilitation." *Id.* at 1101–02. The court focused on the facts that the condition was an impediment to Wolf Child's ability to act as a "responsible father" and that it prohibited him from "being in the company of any *male* child under the age of 18 (without prior approval from his probation officer), including his nephews and cousins" even though "there [was] no evidence whatsoever that Wolf Child ha[d] any sexual interest in young boys or indeed males of any age." *Id* at 1101.

Here, the district court's imposition of the condition was procedurally unsound. In *Wolf Child*, this Court determined that the condition preventing Wolf Child from being in the company of his two daughters or from socializing with his underage fiancée implicated "particularly significant liberty interest[s]," and therefore required that the district court "support its decision to impose the condition on the record with record evidence that the condition . . . [was] necessary to accomplish one or more of the factors listed in § 3583(d)(1) and involve[d] no greater deprivation of liberty than [was] reasonably necessary," and to accomplish this, "the sentencing court, at the time it impose[d] the restrictive condition," had to "point to the evidence in the record on which it relie[d] and explain how on the basis of that evidence the particular restriction [was] justified." *Id.* at 1092 (internal citations and quotation omitted). A similarly significant liberty interest is at stake here. Although Preston

does not currently have children, he may in the future, and under the terms of his supervised release he could never associate with them without the permission of his probation officer. The district court did not follow the necessary procedure to infringe on this significant liberty interest. However, unlike in *Wolf Child*, where this Court determined that remand was not appropriate because "the record [was] sufficient to determine that there [was] no plausible basis for the imposition of that part of the condition," and the condition was, therefore, substantively unreasonable, facts exist in the record of this case that may justify the imposition of this condition. *See id.* at 1096. It is necessary on remand for the district court to explain adequately its reasons for imposing this condition in light of *Wolf Child* or, if it cannot, to narrow the condition appropriately.

## XI.

We REMAND for the district court to reconsider the plethysmograph testing requirement, to clarify the condition that Preston "shall not possess, view, or otherwise use any other material that is sexually stimulating, sexually oriented, or deemed to be inappropriate by the probation officer and/or treatment provider," to adjust his probation requirements so that they are definite and certain, and to provide adequate explanation for Preston's conditions of supervised release.

**AFFIRMED in part, REMANDED for resentencing**.

NOONAN, Circuit Judge, dissenting:

The only evidence against the defendant is a coerced confession. I will take up the elements of the government's case in turn.

## I. The Child's Account

A temptation exists to refer to the child's story as "testimony." The government in its brief (e.g. p. 69) and the majority in its opinion (e.g. Maj. Op. at 27) yield to this temptation. But the child's story is not testimony. The story was not told under oath. The story was not subject to cross-examination. It was only an unsworn and untested tale.

The district court found a dozen or more facts of the child's tale were "obviously not factual":

-that Preston came to the child's house and had threatened to kill him the previous day;

-that the child called 911;

-that Preston tried to stab the child with a knife;

-that the child locked Preston in the child's bedroom with a key;

-that Preston climbed out of the window and onto the roof and jumped off;

-that the child was hiding under a blanket so Preston could not see him;

-that Preston followed the child's tracks and fell into a water hole;

-that Preston then drove a monster truck off a cliff and the police followed him with helicopters and cars;

-that the child threw knives at Preston's heart;

-that Preston tried to rape the child's sister, but that he did not because kittens scratched him;

-that the child ran outside and killed a robber and almost killed Preston.

In the farrago of fantasy, no fact identifies itself as worthy of belief.

After examining the child, the forensic examiner concluded:

[He] described events that are unsupported by the subsequent forensic examination of the victim and his clothing. For example, the victim indicated that during the course of the assault Preston ejaculated in his mouth, on his lips, on his red shirt, and on his stomach. The forensic examination of the victim and the clothing he was wearing nevertheless revealed neither evidence of any semen nor the existence of any red shirt. For that matter the physical examination of the victim showed no signs of trauma or semen.

It is undisputed that there exists no physical evidence of sexual contact. The forensic examiner, a key government witness, found no semen and no trauma.

## II. Inconclusive DNA Evidence

The government does not argue that there exists DNA evidence of sexual contact between the child and Preston.

## III. Confession Alone Is Not Enough

A defendant cannot be convicted on a confession alone. In *United States v. Norris*, 428 F.3d 907, 915 (9th Cir. 2005), this circuit found that the state must "introduce sufficient evidence to establish that the criminal conduct at the core of the offense has occurred." *Norris*, 428 F.3d at 914-15 (citing *United States v. Lopez-Alvarez*, 970 F.2d 583, 592 (9th Cir. 1992)). Accordingly, this circuit reversed the defendant Norris's conviction for sexual molestation because the "government produced no evidence to corroborate Norris's confession that the core of the act, Norris's touching of T.V.'s vulva with his penis, actually occurred." *Id.*

Here, the government has produced no evidence to corroborate Preston's confession that the "core of the act" – sexual contact – "actually occurred." *Id.*

## IV. Failure of Confession to Satisfy Statute

Even if we were to consider the confession alone, violating the law of this circuit, Preston's confession fails to satisfy the statute. The government must prove beyond a reasonable doubt that Preston was guilty of "knowingly engag[ing] in abusive sexual contact" with the "intent to

abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." 18 U.S.C. §§ 2244, 2245(3). Preston's confession shows no such intent.

### V. The Coerced Confession of The Mentally Retarded Youth

Preston's "confession" should not be considered at all because it is involuntary.

Agent Kraus and Investigator Secatero questioned Preston on the front porch of his house. Secatero told Preston that "there's two types of people." The first type was a "monster," a "sexual predator," the "type to prey on little kids." This type was a "cold-hearted person" for whom they "don't show any sympathy." The second type, Kraus and Secatero explained, was not a monster but a "guy that had a bad day" who did a "one time thing." This second type could "move on," because what transpired was "just a misunderstanding." Secatero told Preston that the officers wanted to know "which kind of person" he was. He asked Preston, "Which … person are you? Are you that type where you prey on little kids?" Preston said he was not.

After giving Preston two criminal alternatives, Secatero and Kraus proceeded to ask Preston a series of questions that forced him to choose between damaging admissions:

> -"Is it because […] you wanted to have sex […] or is he the one that came onto you?"

> -"Is it something where you forced the issue or is it something he wanted?"

> -"Did he pull away or did you pull out?"

-"Did all of your penis go in [or] just a little bit?"

-"Did you do it a lot or just that one time?"

In each case, Preston chose the less damaging admission. At times, the loaded questions were more akin to statements. To these, Preston was silent, said he didn't know, or denied the claims. Agent Kraus said, for instance, "He pulled his pants down?" Preston said he didn't know. Kraus said, "Did you pull your pants down too?" Preston said, "No." Kraus said, "You just unzipped your zipper?" Preston was silent. Kraus said, "He pulled his pants up and I assume you zipped up, too." Preston was silent. Nearly every detail was planted by the officers.

Loaded questions are difficult for intelligent persons. For a feeble mind, they are nearly impossible. Preston is eighteen and has a brain "like a five year old." He has an IQ of 65. Preston's IQ places him in the range of mental retardation. *Atkins v. Virginia*, 536 U.S. 304, 309 n.5, 318 (2002). When asked whether he was "disabled," Preston asked the officers to explain the word's meaning. When explained the word's meaning, Preston agreed that he probably was disabled. *See* Morgan Cloud, *Words Without Meaning: The Constitution, Confessions, and Mentally Retarded Suspects*, 69 U.CHI. L. REV. 495, 511-13 (2002) (finding that mentally retarded people do not understand their limitations and "feel compelled to answer a question, even if the question exceeds [their] ability to answer").

No one can seriously argue that the paper signed by Preston was comprehended by Preston as a document of grave legal import. Kraus told Preston that the paper was

merely a way to say "sorry" to [the child]: "Do you want to write any – usually what we do is we write a statement. If, like, you wanted to say sorry or something like that. You could definitely do that. And we can provide that to him." Preston's response was hardly assent: "I'll just say I'm sorry for what I did, but they're just trying to accuse me of that shit. But fuck – I mean, not like that." Ignoring Preston's equivocation, Kraus assured Preston that the statement was "just a kind of summary."

The "summary"—Preston's confession—was a brief gathering of details selected by the officers, culled to their purposes, and written by their hand. The details they selected were details they had fed him. Not once did Preston revise, correct, or counter the officers' dictation of the statement. Agent Kraus said, for instance, "You just unzipped your zipper?" Preston was silent. Kraus said, "You pulled your penis out, and you put a condom on?" Preston was silent. Each of these details was transferred into the written statement. Kraus asked Preston, "Do you want me to put you're sorry […]? Are you sorry or not sorry?" Preston chose the option that kindergarten teaches as proper. When Agent Kraus finished writing the statement, he said to Preston, "I'm going to have you sign this." Preston signed.

There is no evidence that Preston read what the officer wrote. It is difficult to describe Preston's choice between bad alternatives, actual denials, and ambiguous silence as "a product of a rational intellect and a free will," a necessary condition for an admissible confession. *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960).

The majority asserts that coercion of a mentally impaired person "appears to turn largely on the length of the

interrogation." This reading is unsubstantiated. Nowhere does case law state such a rule. Length of an interrogation is one factor; mental deficiency is another. A short interrogation does not reduce the relevance of the defendant's mental capacity.

The majority notes that the interrogation occurred at Preston's house with others present. Yet Preston was distinctly vulnerable at his house. Both officers had arrived in unmarked vehicles, and both were dressed in plain clothes. Preston had no prior record and had never spoken to police before. The officers undoubtedly checked his record and knew he lacked experience with law enforcement. The officers learned quickly that neither Preston's mother nor father was home. Preston himself was eighteen years old. The only others present were two children. Questioning Preston, the officers rapidly surmised his questionable mental capacity, asking him point-blank if he was disabled. By himself on his porch, Preston was vulnerable.

## VI. Unreliability of Confessions From Mentally Retarded People

Confessions from mentally retarded people are prone to be false.

Preston's confession is unreliable. Preston was ready to sign a confession to a crime with the wrong date and did so. The police officers told Preston, at least *fifteen* times, that he had been home on Friday to commit the crime; the officers later admitted that they meant to say Wednesday. Although Preston had a regular routine on Fridays of leaving his house to see his aunt, he was so suggestible that he agreed with the officers that he had been home on Friday. Preston's statement

meets the textbook case of a false confession: Preston was given a false detail of the crime, and he accepted it as an actual fact. ("One method for checking the authenticity of a voluntary confession, or one that seems to be the result of a mental illness, is to introduce some fictitious aspects of the crime and test whether the suspect will accept them as actual facts relating to the occurrence." F. INBAU, J. REID, J. BUCKLY, & B. JANE, CRIMINAL INTERROGATIONS AND CONFESSIONS, 349 (5th ed. 2011)).

As the officers dictated the statement for Preston to sign, Preston was either silent or made unintelligible sounds. The truth of what transpired remained unarticulated by him. As researchers have found, the "tendency [of retarded people] to mask their disabilities," combined with the widespread ignorance of mental retardation, "make it difficult for police and others to properly interpret the responses of mentally retarded persons." Eugene R. Milhizer, *Confessions After Connelly: An Evidentiary Solution for Excluding Unreliable Confessions*, 81 TEMP. L. REV. 1, 15 (2008). As a result, police detectives can "create false confessions by pressuring the suspect to accept a particular account and suggesting crime facts to him, thereby contaminating [his] narrative." John B. Gould & Richard A. Leo, *One Hundred Years Later: Wrongful Convictions After a Century of Research*, 100 J. CRIM. L. & CRIMINOLOGY 825, 849 (2010).

Confessions from mentally retarded suspects, in particular youth, are "per se untrustworthy." *See* Welsh White, *False Confessions and the Constitution: Safeguards Against Untrustworthy Confessions* (1997), 32 HARV. C.R.-C.L. REV. 105. In a recent study of the first 200 DNA exonerations in the U.S., 35% of the false confessors were 18 years or younger and/or had a developmental disability. Saul M.

Kassin et al., *Police-Induced Confessions: Risk Factors and Recommendations*, 34 LAW & HUM. BEHAV. 3, 19-22 (2010). Another study found that 69% of the exonerated persons with mental disabilities were wrongly convicted because of false confessions. *Id. See also* Brandon L. Garrett, *The Substance of False Confessions*, 62 STAN. L. REV. 1051, 1064 (2010) ("Mentally disabled individuals and juveniles are both groups long known to be vulnerable to coercion and suggestion."); Gould at 847 (noting that "the developmentally disabled, cognitively impaired, juveniles—all of whom tend to be unusually suggestible and compliant"—are more likely to confess falsely); Milhizer at 14 ("Certain characteristics common among mentally retarded persons make them particularly prone to confess falsely. For example, mentally retarded suspects are often motivated by a strong desire to please authority figures, even if to do so requires them to lie and confess to a crime they did not commit. They also often lack the ability to understand the nature of police questioning.").

The majority writes that recognizing the cognitive impairment of Preston and his susceptibility to coercion would "significantly broaden" this court's jurisprudence. The law is more capacious than the majority admits. In *Atkins*, the Supreme Court determined that, due to "cognitive and behavioral impairments," including "the diminished ability to understand and process information, to learn from experience, to engage in logical reasoning," mentally retarded people categorically are at risk of producing false confessions. *Atkins*, 536 U.S. at 320. Indeed, the Court noted the exonerations of mentally retarded people who had "unwittingly confessed to crimes they did not commit." *Id. See also Culombe v. Connecticut*, 367 U.S. 568, 620 (1973) (holding involuntary the confession extracted from a "thirty-

three-year-old mental defective . . . with an intelligence quotient of sixty-four"); *Commonwealth of the Northern Mariana Islands v. Mendiola*, 975 F. 2d 475 (9th Cir. 1993) (finding confession involuntary on the basis that "consideration of defendant's reduced capacity is critical because it rendered him more susceptible to subtle forms of coercion," and citing the low intelligence of defendants in *Reck v. Pate*, 367 U.S. 433 (1961) and *Payne v. Arkansas*, 356 U.S. 560, 562, 567 (1958)).

\*

The majority thoughtfully asked the district court to reconsider its order approving the plethysmograph, but the majority does not ban it. I have already expressed in a concurring opinion a critique of this procedure. *See United States v. Weber*, 451 F.3d 552, 570–71 (9th Cir. 2006). For the reasons stated in my concurrence in *Weber*, I would ban this procedure altogether. Psychiatric researchers have referred to my criticism with approval. *See*, *e.g.*, Michael Harlow and Charles Scott, "Penile Plethysmography Testing for Convicted Sex Offenders," 35 JOUR. OF THE AMER. ACAD. OF PSYCH. AND THE LAW (2007).